

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 18, 2007

**BY HAND**

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
Foley Square
New York, New York  10007

> Re:  **United States v. Kareem Edwards**
>       **07 Cr. 719 (WHP)**

Dear Judge Pauley:

        The Government respectfully submits this letter in response to defendant Kareem Edwards' motion to suppress the physical evidence recovered by officers of the New York City Police Department ("NYPD") in connection with the defendant's arrest on July 6, 2007, for possession of a loaded firearm. Edwards' motion should be denied in its entirety in light of the evidence established at the September 4 and September 10, 2007 evidentiary hearing because, based on the totality of the circumstances, there was reasonable suspicion [i] to conduct a brief investigatory detention of the defendant based on the officers' belief that criminal activity had occurred or was about to occur; and [ii] to conduct a careful and limited search of the defendant's person and automobile based on the Officers' belief that the defendant was armed and dangerous.

### The Evidence at the Hearing

        At the evidentiary hearing, the Government called three witnesses:  Detective Joseph Scialabba, Detective Nuruddin Abdurrahim, and Detective Dennis Estwick, all of the NYPD.  The defense called no witnesses.

        The Officers' testimony established the following:  On July 6, 2007, shortly after 5:00 p.m., a confidential informant (the "CI") contacted Det. Scialabba about a shooting at 1160 East 229th Drive South, Bronx, New York ("1160 East 229"), which is part of the Edenwald Housing Projects.  The CI informed Det. Scialabba that the shooter had gone into 1160 East 229 and was still inside that building.  (Transcript dated September 4 and September 10, 2007 ("Tr."), at 6).  In addition, the CI provided a description of the shooter:  a male black with braids.  (<u>Id.</u>).

The Honorable William H. Pauley III
September 18, 2007
Page 2

The CI has been registered and approved by the NYPD and, over the
past year, has provided reliable information that has served as
bases for numerous search warrants and arrests. (Tr. 6-8).
Detective Scialabba is in touch with, and has personally met, the
CI. (Tr. 7-8).

        After receiving the CI's call, Det. Scialabba and Det.
Estwick went to 1160 East 229 to checkout the building and area.
(Tr. 9; 96). The officers did a "vertical" -- i.e., a visual
inspection of the stairwells and floors of a building -- of 1160
East 229 and knocked on the doors of several apartments, but did
not find the gunman or other suspicious individuals. (Tr. 9-10;
96). While in the area, the officers conferred with other NYPD
officers who had responded to the shooting and also spoke to
individuals at the scene. (Tr. 10, 96; "Sprint Report" of 7/6/07
("Sprint Report") (attached as Exhibit D to defendant's motion to
suppress)). Thereafter, Det. Scialabba performed several
computer searches relating to both 1160 East 229 and individuals
who had previously been arrested for narcotics offenses in the
area, and printed out several photographs of individuals who
matched the CI's description of the possible shooter. (Tr. 11;
96-97).

        Thereafter, members of the NYPD Bronx Narcotics Field
Team (including Det. Scialabba, Det. Estwick, Det. Abdurrahim,
Det. Velez, and Lt. Byrnes) assembled for a tactical meeting,
during which the evening's "buy-and-bust" operation was
discussed, in addition to the earlier shooting at 1160 East 229.
(Id.) Det. Scialabba showed photo results of his computer
searches to his teammates and provided them with the physical
description that the CI had previously given him -- i.e., a male
black with braids. (Tr. 11-12; 80). Following the meeting, the
officers traveled to 1160 East 229 in unmarked SUVs, reaching the
area around dusk. (Tr. 13-14). Det. Estwick., Det. Scialabba,
Det. Abdurrahim (who was driving) rode together in the same SUV,
which stood higher than an ordinary police car. (Tr. 14-15; 87;
104). Upon approaching East 229th Drive South -- or the
"horseshoe" drive off East 229th Street (the "Horseshoe") -- the
NYPD Evidence Collection Team was completing their investigation.
(Id.).

        The officers drove slowly along the Horseshoe, and
observed an individual (whom the officers later determined to be
the defendant Kareem Edwards) walking away from 1160 East 229
along the pedestrian path that abuts the area parking lot. (Tr.
16). The officers first observed Edwards when their vehicle was
approximately between one-third and one-half of the way down East
229th Drive South, or after they had completed their rounding of
the first corner of the Horseshoe. (Tr. 55; 99-100). At that

The Honorable William H. Pauley III
September 18, 2007
Page 3

point, the officers were approximately 24 to 25 parking spaces away from the defendant. (Tr. 66). The officers continued to drive forward slowly, and the defendant was observed walking quickly toward the line of parked cars, with his head down, clutching a cloth that was concealing something. (Tr. 16; 20-21). The defendant held the cloth like a football. (Id.).

Edwards approached a car, which had been parked with its back wheels against the curb and its front wheels facing into the street. (Tr. 17; 63). He opened the car's driver's side door, and bent down and into the vehicle as if he were placing something on the driver's side floor. (Tr. 21; 57-58). The defendant then got into the car, and the officers pulled their SUV next to the defendant's car. (Tr. 17-18; 81-82; 100). All three officers got out of the SUV. Det. Estwick focused his attention on the approximately ten to eleven individuals standing in front of the building on the north side of the Horseshoe. (Tr. 101). Det. Scialabba and Det. Abdurrahim approached the defendant's car; Det. Scialabba went to the passenger's side and Det. Abdurrahim went to the driver's side. (Tr. 18; 82). The officers asked the defendant several questions. First, the officers asked about the ownership of the vehicle, to which the defendant gave conflicting answers. (Tr. 18; 84). Next, the officers asked the defendant for his license, which he produced. (Tr. 18; 84; 101). Det. Scialabba recognized the name on the license as related to a name relevant to one of the team's prior investigations. (Tr. 19). During this interaction, the defendant was evasive, and moved his arms around and looked over his shoulder. (Tr. 84).

The officers asked to the defendant to get out of his car and they performed a protective pat-down, which turned up nothing. (Tr. 19; 84). From the passenger-side of the car, Det. Scialabba went to the area where he saw Edward's bend down with the above-mentioned cloth. (Tr. 19). Det. Scialabba put his hand underneath the driver's side seat and felt the cloth, which had the outline and feel of a gun. (Tr. 19). Det. Scialabba pulled out the cloth (a ripped green towel) and found a loaded .45 caliber Llama semiautomatic pistol. (Tr. 19-20; 22). Det. Scialabba then yelled "hot lunch" (a coded reference for a firearm) to alert the other officers about the gun. (Tr. 22; 85; 102). After a brief struggle, the defendant was placed under arrest. (Tr. 23; 86-87; 102-103). Back at the precinct, the defendant stated something like "You got me with the hammer, it's no big deal." (Tr. 23; 103).

The Honorable William H. Pauley III
September 18, 2007
Page 4

## **Applicable Law**

Fourth Amendment law recognizes three types of interactions between government agents and private citizens: (i) consensual encounters, which require no justification; (ii) investigative detentions, which require "reasonable suspicion" to believe that criminal activity has occurred or is about to occur; and (iii) arrests, which require a showing of probable cause. United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995); United States v. Hooper, 935 F.2d 484, 490 (2d Cir. 1991).

A police officer may conduct a brief "investigative detention" or "Terry stop" by stopping a person to investigate possible criminal behavior, as long as at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (citing United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992)); see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). Reasonable suspicion arises when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).

"Reasonable suspicion" is measured by an objective test, Glover, 957 F.2d at 1010, and reviewing the circumstances as a whole, not as discrete and separate facts, United States v. Barlin, 686 F.2d 81, 86 (2d Cir. 1982). In assessing whether an officer's suspicion was objectively reasonable, a court must consider the "totality of the circumstances." United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000). In that analysis, factors that by themselves suggest innocent conduct may add up to reasonable suspicion when viewed as a whole. See United States v. Arvizu, 534 U.S. 266, 274-75 (2002); see also United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) ("Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.").

The test for reasonable suspicion is a "rather lenient" one, United States v. Santana, 485 F.2d 365, 368 (2d Cir. 1973), which the Second Circuit has described as "not a difficult one to satisfy," United States v. Oates, 560 F.2d 45, 63 (2d Cir. 1977). Under the "reasonable suspicion" standard, "the likelihood of criminal activity . . . falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. As the Supreme Court emphasized in Alabama v. White, 496

The Honorable William H. Pauley III
September 18, 2007
Page 5

U.S. 325 (1990), "reasonable suspicion can be established with
information that is different in quantity or content than that
required to establish probable cause [and] can arise from
information that is less reliable than that required to show
probable cause."  Id. at 330.

        Reasonable suspicion is measured from the objective
perspective of a trained and experienced law enforcement officer.
Cortez, 449 U.S. at 418; United States v. Forero-Rincon, 626 F.2d
218, 221-22 (2d Cir. 1980).  "[T]he 'actual motivations of the
individual officers involved' in the stop 'play no role' in the
analysis."  Holeman v. City of New London, 425 F.3d 184, 190 (2d
Cir. 2005) (quoting Wren v. United States, 517 U.S. 806, 813
(1996)).  The reasonable suspicion analysis "does not deal with
hard certainties, but with probabilities," and properly takes
into account that trained law enforcement agents may make
observations and draw conclusions that go beyond the capacity of
a lay person.  Cortez, 449 U.S. at 418; Villegas, 928 F.2d at 517
(suspicion reasonable if appears suspect to trained observer);
see also Ornelas v. United States, 517 U.S. 690, 699-700 (1996)
(while ultimate review of reasonable suspicion determination is
de novo, deference should be given to experience of police
officers involved).

        Reasonable suspicion may be based on a variety of
factors, including an individual's presence in a high-crime
neighborhood, "nervous, evasive behavior," and "unprovoked flight
upon noticing the police."  Illinois v. Wardlow, 528 U.S. 119,
124 (2000); see id. at 125 ("Allowing officers confronted with
such flight to stop the fugitive and investigate further is quite
consistent with the individual's right to go about his business
or to stay put and remain silent in the face of police
questioning.").  In short, "the determination of reasonable
suspicion must be based on commonsense judgments and inferences
about human behavior."  Id.

        After stopping a suspect pursuant to reasonable
suspicion, an officer is permitted to conduct a protective search
for weapons if the officer has "reason to believe that he is
dealing with an armed and dangerous individual, regardless of
whether he has probable cause to arrest the individual for a
crime."  Terry, 392 U.S. 1, 27 (1968).  The officer need not be
absolutely certain that the suspect is armed; but rather, may
conduct the protective search if a reasonably prudent man in the
officer's position "would be warranted in the belief that his
safety or that of others was in danger."  Id.; see also United
States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) ("A law
enforcement agent, faced with the possibility of danger, has a
right to take reasonable steps to protect himself and an

The Honorable William H. Pauley III
September 18, 2007
Page 6

obligation to ensure the safety of innocent bystanders,
regardless of whether probable cause to arrest exists.").

　　　　Courts must also consider that often the police are
acting in "a swiftly developing situation," United States v.
Sharpe, 470 U.S. 675, 686 (1985), and "should not indulge in
unrealistic second-guessing as to the means law enforcement
officers . . . employ to conduct their investigations." Glover,
957 F.2d at 1010-11 (quotations omitted). In part for that
reason, there are no "hard and fast rules for evaluating the
conduct of law enforcement agents conducting investigative
stops." Alexander, 907 F.2d at 272. Rather the touchstone
remains reasonableness in all the circumstances, and thus even
"[t]he fact that an investigative stop might, in the abstract,
have been accomplished by some less intrusive means does not, in
and of itself, render a stop unreasonable." Alexander, 907 F.2d
at 273 (citing Sharpe, 470 U.S. at 686-87). Instead, so long as
the failure to pursue the less intrusive alternative is itself
reasonable, the stop remains valid. Id.

## Discussion

### A.  The Officers Had Reasonable Suspicion Sufficient to Justify an Investigative Stop of Edwards

　　　　Edwards first contends that the officers lacked
reasonable suspicion sufficient to justify an investigative stop.
In particular, Edwards contends that he was stopped and
questioned several hours after gunshots were heard in the
neighborhood and without a particularized description of the
shooter. (Defendant's Motion to Suppression dated August 22,
2007 ("Def. Br.") at 4-5). In contending that the officers' stop
of Edwards was unsupported by reasonable suspicion, Edwards
relies heavily on Florida v. J.L., 529 U.S. 266 (2000). Although
Edwards' comparison of his case to J.L. has some surface appeal,
J.L. is easily distinguishable.

　　　　In J.L., the Supreme Court held that an anonymous tip
that a person is carrying a gun is not, without more, sufficient
to justify a police officer's stop and frisk of that person.
J.L., 529 U.S. at 268. In that case, an anonymous caller told
the police that "a young black male standing at a particular bus
stop and wearing a plaid shirt was carrying a gun." Id. There
was absolutely no information provided as to the caller's
identity – the caller did not give his name, there was no
recording of the call, and the caller's number was not recorded.
Id. Arriving at the bus stop, the police saw three black males,
including J.L., a juvenile who was wearing a plaid shirt. Id.

The Honorable William H. Pauley III
September 18, 2007
Page 7

The police did not see a firearm nor did they observe J.L. or any of the other men making any suspicious movements.  Id.  An officer frisked J.L. and found a gun in his pocket.  Id.

        In upholding the Florida Supreme Court's invalidation of the stop and frisk, the Supreme Court held that an anonymous tip "lacking indicia of reliability" cannot justify an investigative stop, without additional information.  Id. at 274.  The Court observed that "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity."  Id. at 270 (citation omitted; emphasis supplied).  The Court recognized, however, that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop."  Id. (internal quotation and citation omitted).  For example, predictive information about a person's movements could indicate reliability.  Id. at 271.

        Edwards' case differs from that of the defendant in J.L. in several respects, and ample evidence supports the officers conducting a Terry stop and frisk of the defendant:

- Unlike, J.L., the officers did not rely principally on an anonymous tip.  Here, the officers had a specific and particularized description of the shooter from a reliable and dependable CI, with whom the officers had frequent communications including personal meetings.  (Tr. 6-8).  Indeed, the CI has been deemed reliable enough by the NYPD that the CI has been formally registered after approval by a commanding officer.  (Id.);

- Both the description and location provided by the CI were corroborated by the police dispatcher's description of the shooter: a male black carrying a firearm into 1160 East 229. (Tr. 6; Sprint Report);

- The officers corroborated the description of the shooter through their communications with officers from 47th Precinct and neighbors.  Tr. 6-8; 10; 96; see United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986), cert. denied, 479 U.S. 1067 (1987) ("The [collective knowledge doctrine] that permits courts to assess probable cause to arrest by looking at the collective knowledge of the police force-instead of simply looking at the knowledge of the arresting officer . . . exists because, in light of the complexity of modern police

The Honorable William H. Pauley III
September 18, 2007
Page 8

- Edwards was seen walking quickly away from 1160 East 229 -- i.e., the same building into which the shooter was reported and suspected to have hidden -- immediately after the police had departed the scene. (Tr. 6, 15; Sprint Report);

- Edwards was seen carrying a towel that appeared to be concealing a heavy object. He was walking quickly with his head down. (Tr. 16-21);

- The officers saw Edwards lean into the car towards the driver's seat while clutching the towel-wrapped object. (Tr. 21; 57-58); and

- Edwards' actions upon seeing the police gave rise to additional suspicion. Edwards began acting nervously and evasively, moving his arms around and looking over his shoulder, when being questioned by the officers, unlike the defendant in J.L., who "made no threatening or otherwise unusual movements." J.L., 529 U.S. at 268.

Significantly, unlike J.L., the CI in this case was known and reliable, and had provided previous, actionable information. "[A] face-to-face informant must . . . be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." United States v. Walker, 7 F.3d 26, 30 (2d Cir. 1993) (quoting United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991)); United States v. Bold, 19 F.3d 99, 102 (2d Cir. 1994). Even if the face-to-face informant's motives may be unknown, "his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." Illinois v. Gates, 462 U.S. at 234; United States v. Salazar, 945 F.2d 47, 51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false.").

United States v. Elmore, 482 F.3d 172 (2d Cir. 2007), is particularly helpful. In Elmore, the Second Circuit recently concluded that, where a known informant has be found to be reliable from past experience, "no corroboration will be required

The Honorable William H. Pauley III
September 18, 2007
Page 9

to support reasonable suspicion." Id. at 181.[1]  There, the
Second Circuit considered the Government's interlocutory appeal
after the district court suppressed the firearm found in Elmore's
car.  The Norwalk Police received a telephone call from a woman
(who identified herself as "Dorothy") claiming to be a close
friend of Elmore, and provided her home and cell phone numbers.
Id. at 175.  "Dorothy" told the police that Elmore was in
possession of weapons and might harm somebody.  The officers had
never talked to or used any information provided by Dorothy,
though they did talk to her approximately four times that day.
Id.  The police subsequently learned Dorothy's last name, and
took several steps to corroborate both her identity and the
information she provided.  Id. at 176.  Based on the information
provided, the police circulated a memo and photography of Elmore.
Id. at 176-77.  Two days later, two officers spotted Elmore in
his car and pulled him over.  Id. at 177.  They asked him and
another woman to step out of the vehicle.  The passenger
compartment to the vehicle was examined, and a .38 caliber
firearm was recovered from underneath the driver's seat.  Id.
Elmore was placed under arrest and he subsequently moved to
suppress, relying upon Florida v. J.L. and Alabama v. White, 496
U.S. 325 (1990).  The district court suppressed the evidence,
finding that "the tip lacked the necessary indicia of reliability
to establish reasonable suspicion because [the officers were] not

_____

[1]    The Second Circuit, in analogous situations, has also
found that anonymous tips coupled with some corroboration can
support a finding of reasonable suspicion to support a Terry
stop.  See Bold, 19 F.3d 99.  In Bold, the Second Circuit upheld
a stop based almost entirely on an anonymous 911 call informing
police that the occupants of a particular vehicle parked at a
specified location possessed a gun.  The Court held that police
were justified in making a stop when they found the car in the
location specified, parked in a suspicious, isolated location,
and found that it had darkened windows. 19 F.3d at 103.  Bold
especially emphasized that the tip related to possession of a
gun, which creates an "element of imminent danger", and where
waiting to obtain more information "might have fatal
consequences." 19 F.3d at 104.  The Bold Court thus held that
"[w]here the tip concerns an individual with a gun, the totality
of the circumstances test for determining reasonable suspicion
should include consideration of the possibility of the possession
of the gun, and the government's need for a prompt
investigation." Id.  See also United States v. Walker, 7 F.3d at
31 (anonymous tip of suspect with guns, partially confirmed by
police, created reasonable suspicion justifying stop).

The Honorable William H. Pauley III
September 18, 2007
Page 10

able to corroborate sufficiently the information she gave." Id.
at 177-78.

        The Second Circuit reversed.  Tellingly, the Court
opined that the level of corroboration of required is directly
tied to the type and reliability of an informant:

            Under the totality of the circumstances approach
        to assessing probable cause and reasonable suspicion
        mandated by Gates and White, informants do not all fall
        into neat categories of known or anonymous.  Instead,
        it is useful to think of known reliability and
        corroboration as a sliding scale.  Where the informant
        is known from past practice to be reliable, as in
        Williams, no corroboration will be required to support
        reasonable suspicion.  Where the informant is
        completely anonymous, as in White, a significant amount
        of corroboration will be required.  However, when the
        informant is only partially known (i.e., her identity
        and reliability are not verified, but neither is she
        completely anonymous), a lesser degree of corroboration
        may be sufficient to establish reasonable suspicion.
        This approach is consistent with the totality of the
        circumstance inquiry mandated by Gates and White, as
        well as the Supreme Court's characterization of Terry
        as providing an "intermediate response" for
        investigating criminal activity.  Williams, 407 U.S. at
        145.

Id. at 180-81 (emphasis supplied).  Here, like Elmore, the CI is
not only known -- having been authenticated by, and registered
with, the NYPD -- but also has provided reliable information in
the past:  "I've worked with this informant for many months,
almost about a year, and I have numerous search warrants and
arrests because of information that the informant gives me."
(Tr. 6-7).  Furthermore, unlike Elmore, the information provided
by the CI in the instant case was acted upon within a matter of
hours, as opposed to after a few days had passed.  And the facts
and circumstances of the defendant's conduct only add to the
officer's finding of reasonable suspicion.

        Under the law of this Circuit, these facts -- without
more -- support reasonableness.  Holeman v. City of New London,
425 F.3d 184, 192 (2d Cir. 2005) ("In the middle of the night,
the police were in a high crime area with a convicted narcotics
felon who was acting suspiciously.  These facts alone suffice to
support reasonableness."); United States v. Paulino, 850 F.2d 93,
98 (2d Cir. 1988); see also Arvizu, 534 U.S. at 274 ("The
likelihood of criminal activity need not rise to the level

The Honorable William H. Pauley III
September 18, 2007
Page 11

required for probable cause, and it falls considerably short of
satisfying a preponderance of the evidence standard.").  It is
true, that (considered in isolation) a person's mere presence
late at night in a high crime area does not constitute reasonable
suspicion.  Here, however, the officers were not reasonably
suspicious merely because of the hour; rather, they reacted to
the aggregate facts that support the reasonable suspicion
analysis.

        Accordingly, based on [1] the earlier shooting at 1160
East 229, [2] the reliable CI's description of the shooter and
his location, [3] the timing of defendant's departure from 1160
East 229, i.e., immediately after the police had left the scene,
and [4] the defendant's actions and demeanor, the officers had
reasonable suspicion to suspect that the defendant was engaged in
criminal activity and (therefore) to justify an investigative
stop of Edwards.

B.    **The Officers Had Reasonable Suspicion Sufficient to Justify
      a Security Sweep of Edwards' Car**

        Edwards next contends that, even if the Terry stop were
lawful, the subsequent frisk and search of his car were not.
(Def. Br. 6-8).  Specifically, Edwards argues that there was
nothing about "his behavior that objectively and reasonably
suggested he was armed and presently dangerous."  (Def. Br. 6).
He then goes on to suggest that search of the car did not meet
the "automobile exception" (that "allows police to search a car
without a warrant if they have probable cause to believe it
contains contraband") or Michigan v. Long, 463 U.S. 1032 (1983).
Edwards arguments are belied by the facts and the case law.  (Id.
7-8).

        A limited search for weapons, without a warrant and
without probable cause, is permissible in connection with a
lawful custodial interrogation that does not rise to the level of
an arrest, see, e.g., Terry v. Ohio, 392 U.S. 1, 21 (1968), on
the rationale that "if a suspect is 'dangerous,' he is no less
dangerous simply because he is not arrested," Long, 463 U.S. at
1050.  Further, the suspect need not actually be dangerous to
validate such a limited-purpose search, so long as the officer
has a reasonable belief that the suspect poses a danger and may
have a weapon within his reach.  See McCardle v. Haddad, 131 F.3d
43, 48 (2d Cir. 1997) (quoting Long, 463 U.S. at 1049).

        In Long, police approached a man who had driven his car
into a ditch and who appeared to be under the influence of an
intoxicant.  As the man moved to reenter the car from the
roadside, police spotted a knife on the floor-board.  The

The Honorable William H. Pauley III
September 18, 2007
Page 12

officers stopped the man, subjected him to a patdown search, and
then inspected the interior of the vehicle for other weapons.
During the search of the passenger compartment, the police
discovered an open pouch containing marijuana and seized it.  The
Long court upheld the validity of the search and seizure under
Terry.

      The Court held that, in the context of a roadside
encounter

> protection of police and others can justify protective
> searches when police have a reasonable belief that the
> suspect poses a danger. . . . The search of the
> passenger compartment of an automobile, limited to
> those areas in which a weapon may be placed or hidden,
> is permissible if the police officer possesses a
> reasonable belief based on "specific and articulable
> facts which, taken together with the rational
> inferences from those facts, reasonably warrant" the
> officer in believing that the suspect is dangerous and
> the suspect may gain immediate control of weapons.

Id. at 1049 (quoting Terry, 392 U.S. at 21).  "Thus, where there
has been a Terry stop of an automobile, the officer may 'take
steps to assure himself that the person with whom he is dealing
is not armed with a weapon that could unexpectedly and fatally be
used against him,' provided that the officer 'has a reasonable
belief "that the individual whose suspicious behavior he is
investigating at close range is armed and presently dangerous to
the officer or to others.'"  McCardle v. Haddad, 131 F.3d 43, 48
(2d Cir. 1997) (quoting Long, 463 U.S. at 1047 (in turn quoting
Terry, 392 U.S. at 24)).  "Of course, the protective search of
the vehicle, being justified solely by the danger that weapons
stored there could be used against the officers or bystanders,
must be 'limited to those areas in which a weapon may be placed
or hidden.'"  Minn. v. Dickerson, 508 U.S. 366, 374 (1993)
(quoting Long, 463 U.S. at 1049).

      Long simply extends logic of Terry to the automobile
context.  At base, Long stands for the proposition that, where
officers have a specific and articulable suspicion that an
individual may be potentially dangerous, they are justified not
only in conducting a protective frisk of his person (Terry), but
also "the passenger compartment of automobile, limited to those
areas in which a weapon may be placed or hidden" (Long).  Long,
43 U.S. at 1049.  A suspect's presence in a car does not -- and
should not -- impair the police's ability to conduct a protective
frisk to ensure their and others' safety.  This is especially
true in a car-stop situation, which this Circuit has found to be

The Honorable William H. Pauley III
September 18, 2007
Page 13

"especially hazardous and [to] support[] the need for additional
safeguards." <u>United States v. Alexander</u>, 907 F.2d 269, 273 (2d
Cir. 1990).

        Here, as stated <u>supra</u>, ample evidence supported the
officers conducting a <u>Terry</u> stop and frisk of the defendant's
person.  The fact that the defendant happened to enter a car
<u>after</u> these facts were objectively apparent to the officers does
not affect the reasonable suspicion analysis.  By defendant's own
admission, the officers made it to the defendant's car just after
he got into it.  (Affidavit of Kareem Edwards dated August 22,
2007 ¶ 4).  The passage of those few seconds during which Edwards
made it into his automobile did not lessen his potential
dangerousness; rather, it only enhanced the level of danger.
<u>See Alexander</u>, 907 F.2d at 273.  Those facts that gave rise to
the officers' specific and articulable belief that Edwards was
dangerous -- <u>i.e.</u>, Edwards' matching the CI's description of the
shooter at 1160 East 229, his carrying of a concealed heavy
object, and his nervous and evasive demeanor -- remain true
through the entirety of the officers' interaction with the
defendant.

        Lastly, even if there were any question about the
propriety of a security sweep of the car in this case, it cannot
be argued that officers searched any more of the car than was
permitted.  Consistent with the watchwords of <u>Long</u>, Det.
Scialabba performed a limited pat-down of the area where he saw
the defendant might have placed the towel-wrapped object -- under
the driver's side seat.  (Tr. 19-20); <u>see Long</u> (permitting a
search of the passenger compartment of an automobile, limited to
those areas in which a weapon may be placed or hidden).  Det.
Scialabba felt the outside of the cloth, and made out a hard
object in the shape of a gun (Tr. 19-20).  It was only then that
the cloth was pulled from underneath the driver's seat and the
.45 caliber Llama semiautomatic pistol was discovered.  (Tr. 19-
20).

The Honorable William H. Pauley III
September 18, 2007
Page 14

### **Conclusion**

        For the reasons set forth above, defendant's motion to
suppress the physical evidence should be denied.

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney

                  By:         _____
                              Benjamin A. Naftalis
                              Assistant United States Attorney
                              Tel.: (212) 637-2456

cc:  David Patton, Esq.