UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

    UNITED STATES OF AMERICA       :               07 CR. 719 (WHP)

             - v -                                       :

    **KAREEM EDWARDS**                        :

            Defendant.               :

-------------------------------------------------------X


**DEFENDANT KAREEM EDWARDS' POST-HEARING MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE BASED UPON AN ILLEGAL STOP, SEARCH AND SEIZURE**


                                                  LEONARD F. JOY, ESQ.
                                                  Federal Defenders of New York
                                                  Attorney for Defendant
                                                   **Kareem Edwards**
                                                  52 Duane Street - 10th Floor
                                                  New York, New York 10007
                                                  Tel.: (212) 417-8762

                                                  **DAVID E. PATTON, ESQ.**


TO:    MICHAEL J. GARCIA, ESQ.
         United States Attorney
         Southern District of New York
         One. St. Andrew's Plaza
         New York, New York 10007
         Attn: **BENJAMIN NAFTALIS, ESQ.**
              Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **07 CR. 719 (WHP)** |
| - v - | : | |
| **KAREEM EDWARDS,** | : | |
| Defendant. | : | |

-------------------------------------------------------X


**DEFENDANT KAREEM EDWARDS' POST-HEARING MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE BASED UPON AN ILLEGAL STOP, SEARCH AND SEIZURE**


**I.  INTRODUCTION**

The defendant, Kareem Edwards, submits this post-hearing brief in support of his motion to suppress evidence based on the stop, frisk and search conducted on July 6, 2007 by members of the New York Police Department.

The government has failed to meet its burden of proving by a preponderance of the evidence that the stop, frisk and search were legal.  The only testimony arguably supportive of the government's claim came from Detective Scialabba, a detective who has previously lied about conducting an illegal stop and frisk and whose story about what happened here was incredible on its face and contradicted and uncorroborated by the other officers present at the time of Mr. Edwards' stop.

Even accepting the version of events offered by Detective Scialabba, however, the government failed to offer a sufficient rationale for the stop, frisk and search.  Accordingly, as a matter of law, Mr. Edwards' motion should be granted.

## II. FACTUAL BACKGROUND

    A. Mr. Edwards

Mr. Edwards statement of facts is contained in his initial submission to the Court. Among other things, he stated that 1) he was not exiting 1160 229th St. prior to his arrest; 2) he knows nothing about the shooting that occurred earlier that day; 3) he was not carrying anything with him to his car -- and in particular, he was not carrying a towel or a gun; and 4) contrary to the assertions in the Complaint, he never refused to give the police his license or registration and was cooperative in his dealings with them.

    B. Detective Estwick

Detective Dennis Estwick was the driver of the undercover S.U.V. that pulled in front of Mr. Edwards' parked car, initiating Mr. Edwards' stop. (Tr. at 98). He stated that prior to the stop of Mr. Edwards, at some point during his shift on July 6, 2007, he learned from his partner, Detective Scialabba, that someone had been shooting off rounds outside the building at 1160 229th St. (Tr. at 96). He and Detective Scialabba went to the building and conducted a "vertical" -- a search of the building -- during which they found nothing of note. (Tr. at 96). They then returned to the station house where Detective Scialabba gathered various pictures in an effort "to identify who was doing the shooting." (Tr. at 97). Detective Estwick gave no testimony indicating that he ever received a description of the person they might be looking for, but stated that the pictures Detective Scialabba pulled were of tall, black men. (Tr. at 97). After viewing the pictures, he and Detective Scialabba held a tactical meeting with other police officers to discuss returning to the Edenwald projects to do "enforcement." (Tr. at 98). Detective Scialabba never testified that any description of the suspected shooter was given at the tactical meeting.

After the meeting, Detective Estwick drove an unmarked S.U.V. with Detective Abdurrahim in the front passenger seat and Detective Scialabba in the back seat. (Tr. at 98, 104). He could not recall whether Detective Scialabba was in the back driver's seat or the back passenger seat. (Tr. at 104). Upon reaching the back stretch of the "horseshoe" of 229th St., he noticed Mr. Edwards walking down the sidewalk along 229th St. (Tr. at 99-100). He viewed Mr. Edwards for approximately 10 to 15 seconds and did not notice anything unusual about his appearance. (Tr. at 107). He never testified that Mr. Edwards was carrying a towel or that Mr. Edwards was walking quickly to his car.

While on the back stretch of 229th St., someone in the S.U.V. said something to the effect of "there he go" referring to Mr. Edwards. (Tr. at 100). Detective Estwick did not remember whether it was Detective Abdurrahim or Scialabba who made the statement. (Tr. at 104). In response, Detective Estwick pulled the S.U.V. in front of the parked car that Mr. Edwards was entering. (Tr. at 105). He did not say that he saw Mr. Edwards make any movement as though he were putting something under the seat.

After stopping the S.U.V., Detectives Adburrahim and Scialabba approached Mr. Edwards while Detective Estwick addressed a small crowd of people that had gathered on the opposite side of the street. (Tr. 100-101). Detective Estwick did not see the specifics of the interaction between his fellow detectives and Mr. Edwards when they first spoke. He recalled that Detectives Scialabba and Abdurrahim were speaking with Mr. Edwards and that at some point, Detective Scialabba shouted "hot lunch" which is code for firearm.

At no time during his testimony did Detective Estwick state that he observed Mr. Edwards carrying anything or doing anything suspicious.

B. <u>Detective Abdurrahim</u>

Detective Abdurrahim first became aware of a shooting in the vicinity of 1160 229th Street when he was told about it by Detectives Scialabba and Estwick in the precinct station house. (Tr. at 79). He believed that the report of shots fired had come from a 911 call and was not aware of any other source of information for the report. (Tr. at 92). He stated that he attended a tactical meeting prior to joining Detectives Scialabba and Estwick on a trip to the Edenwald houses to "do enforcement." (Tr. at 80). At no time was he given any physical description of a suspected shooter. (Tr. at 89). He rode to the Edenwald houses with Detectives Estwick and Scialabba and was seated on the passenger side of the vehicle but did not remember whether he was in the front or back. (Tr. at 87).

Detective Abdurrahim stated that he first became aware of Mr. Edwards when one of his fellow detectives said something about stopping him. (Tr. at 82, 88). He did not recall precisely what was said to initiate the stop, and he did not know why the stop was being made. (Tr. at 82, 88). When he first saw Mr. Edwards, Mr. Edwards was in the process of getting into his car. (Tr. at 86). He did not testify that he saw Mr. Edwards holding anything, and he did not testify that he saw Mr. Edwards lean down into the car as though he was placing something under the seat. His sole basis for approaching Mr. Edwards was the suggestion by one of his fellow officers that they stop Mr. Edwards. (Tr. 82, 88).

Detective Abdurrahim stated that he approached Mr. Edwards' car on the driver's side where Mr. Edwards was "starting to sit inside the vehicle." (Tr. at 83). As Mr. Edwards got in the car and started to close the driver's side door, Detective Abdurrahim held open the door so that Mr. Edwards could not close it. (Tr. at 83). He then asked Mr. Edwards questions about the

ownership of the car, which Mr. Edwards answered. (Tr. at 83-84). He also asked Mr. Edwards for his driver's license, which Mr. Edwards produced. (Tr. at 84). When asked to describe Mr. Edwards' demeanor he stated in general terms that Mr. Edwards was "very evasive, moving his arms a lot and looking over his shoulder." (Tr. at 84). He did not describe how Mr. Edwards conduct was evasive, how he was moving his arms or what he seemed to be looking at over his shoulder. He also did not cite a single instance of Mr. Edwards refusing to provide requested documents or refusing to answer questions or follow orders.

After reviewing Mr. Edwards' license and passing it to "another member of [his] field team," Detective Abdurrahim asked Mr. Edwards to get out of the car whereupon he frisked him and found nothing. (Tr. at 84-85). At approximately the same time that Detective Abdurrahim was frisking Mr. Edwards, Detective Scialabba was searching the car from the passenger side. (Tr. at 85). Shortly after Detective Abdurrahim finished his frisk, Detective Scialabba yelled "hot lunch," indicating he had found a gun, and Detective Abdurrahim placed Mr. Edwards under arrest. (Tr. 85).

    C. <u>Detective Scialabba</u>

        1. <u>Prior Lies Regarding an Illegal Stop and Search</u>

In February 2005, the Civilian Complaint Review Board ("CCRB") substantiated claims against Detective Scialabba (then Police Officer Scialabba) and his partner for an illegal stop and frisk. In doing so, it found that "PO Scialabba was not credible." (<u>See</u> CCRB Case Report, attached hereto as Exhibit E at 5).

The underlying incident involved the stop and frisk of a 29-year-old black male, Philmore Johnson, whom Police Officer Scialabba and his partner claimed had made nervous gestures and

who had put something in his back pocket where there was then a visible bulge. (Id. at 2). The complaining witnesses stated that the officers stopped and frisked Mr. Johnson for no legitimate reason, made derogatory remarks about Mr. Johnson's Jamaican heritage, claimed that they were stopping him because he "matched a description," took his identification to take down his personal information and after reviewing it, threw it down on the ground rather than handing it back to him. (Id.).

Of the four witnesses that were interviewed (the two complaining witnesses and Police Officer Scialabba and his partner), the CCRB found Police Officer Scialabba the least credible. (Id. at 6) (noting his inconsistent answers to several questions and his selective lack of memory about events despite having been the officer to fill out the paperwork in the case). The CCRB concluded that the officers could not have seen a bulge in Mr. Johnson's back pocket because he was seated at the time of the initial encounter. (Id. at 6-7). In addition, the Board found that the officers falsely told Mr. Johnson that they were stopping him because he matched a description they had received over the radio of a criminal suspect. (Id. at 7). While substantiating the abuse of authority claims arising from the stop and frisk, the Board did not substantiate the claims involving the derogatory comments and rude behavior because the complaining witnesses could not identify which officer made the comments. (Id. at 7) (noting that the two witnesses lived in South Carolina and were not available for a photo array of the officers).

The CCRB's findings here are significant. It is highly unusual for the CCRB to find a police officer not credible and to substantiate an allegation. For the year to date in 2007, only 5.2 percent of all allegations reported to the CCRB have resulted in a substantiated finding. (See

CCRB Disposition of all Allegations, attached hereto as Exhibit F).[1]

    2. <u>Detective Scialabba's Testimony</u>

Detective Scialabba testified that at some time near the beginning of his shift on July 6, 2007, he received a call from a confidential informant who told him that a "male black with braids" had fired shots near 1160 229th St. and "possibly went into 1160." (Tr. at 6). He never testified about how the informant obtained this information, whether it was firsthand, or through several layers of hearsay. He then went to 1160 with Detective Estwick where they did a "vertical" which he described as looking throughout the hallways of the building for "anybody that wasn't supposed to be in the building." (Tr. at 9). This was accomplished by stopping people in the building and asking for identification and questioning them about where they lived and what they were doing. (Tr. at 29). After searching the building and finding nothing of note, the detectives returned to the precinct station where Detective Scialabba pulled pictures from a computer database of various people with criminal records who lived in 1160. He stated that he pulled two or three pictures that he intended to show his confidential informant "later in the night." (Tr. at 11). He did not explain why he did not plan to show his informant the photographs prior to going to the Edenwald projects to look for the shooter. He stated that he showed his field team the photographs and that he and Detectives Estwick and Abdurrahim went to the Edenwald houses in one vehicle while his lieutenant and another detective joined in another. (Tr. at 14). Detective Scialabba's stated purpose for going to the Edenwald houses was to "just go over there and see if we could, you know, stop a few people that shouldn't be in the area or that are suspiciously in the area, suspicious in the area." (Tr. at 11-12).

---

    [1] The full report can be found online at http://www.nyc.gov/html/ccrb/html/about.html.

Detective Scialabba claims that he told his entire field team, including Detectives Estwick and Abdurrahim, of the informant's description of a black man with braids. (Tr. at 12). That claim, however, was flatly contradicted by Estwick and Abdurrahim. Detective Abdurrahim stated that he was never given any description and that he believed the report of the shooting had only come from a 911 call. (Tr. at 89). Detective Estwick testified that he saw photographs of tall, black men, but did not mention anything about braids. He also never stated that Scialabba told him anything about a description of a suspect or that Scialabba mentioned receiving information from an informant.

Upon arriving at the Edenwald houses, after rounding the bend of 229th St., at approximately 8:30 p.m., from across the street at a distance of approximately 25 parking spaces filled with cars, Detective Scialabba claimed to see Mr. Edwards walking down the sidewalk with a towel in his hand held closely to his body. This observation occurred over three hours after the initial reports of the shots fired. Contrary to Detective Estwick's testimony that Detective Abdurrahim was in the front seat, Detective Scialabba claimed to be in the front seat of the S.U.V. (Tr. at 14). He described the allegedly suspicious nature of the way Mr. Edwards was acting as follows:

> I saw something like, like it was, like, someone was clutching like a football, not holding it in a way you hold a football, walking fast with his head down and that person went into the car here, the car parked right here.

(Tr. at 16). He also stated that when Mr. Edwards got to his car and opened the door, he made a motion downward and that it was at that time that "we decided to stop this person." (Tr. at 17). In explaining his decision to stop Mr. Edwards, Detective Scialabba stated the following:

> Just there was a description, he looked like the person that I was referred to by my

9

informant earlier, male black, tall, with braids; the way he was walking was quick and he had his head down and he went -- so it was the person I wanted to, I wanted to talk to. (Tr. at 17-18).  To initiate the stop, Detective Scialabba stated something along the lines of "let's talk to him" or "let's stop him."  (Tr. at 60).  He never told his fellow detectives that he believed Mr. Edwards might have a gun, and he and his fellow detectives did not approach Mr. Edwards with their guns drawn.  (Tr. at 60).

After the undercover S.U.V. stopped in front of Mr. Edwards' car, Detective Scialabba went to the passenger side of Mr. Edwards' car while Detective Abdurrahim went to the driver's side.  (Tr. at 18).  Detective Scialabba testified that they "engaged Mr. Edwards in a conversation about whose car it was and asked him to produce a license."  (Tr. at 18).  Mr. Edwards complied with all the requests made of him, and Detective Scialabba made no mention of him being uncooperative or in any way acting nervous or suspicious.  (Tr. at 18).

After Mr. Edwards was asked about the car and was asked for his license, he was asked to step out of the car.  (Tr. at 19).  After he got out of the car, Detective Abdurrahim frisked him while Detective Scialabba searched the car from the passenger side.  (Tr. at 19).  Detective Scialabba also testified that the name Edwards "rung a bell, basically" at some point after he had looked at the license.  (Tr. at 19).  He could not recall specifically why the name range a bell except that he remembered the name Edwards from a prior investigation.  (Tr. at 19).

Upon searching underneath the driver's side seat from the passenger side of the car, Detective Scialabba found a handgun.  He shouted "hot lunch," and Mr. Edwards was placed under arrest.

**III. ARGUMENT**

As the CCRB has previously concluded, Detective Scialabba was not credible. His story was implausible on its face and was uncorroborated and contradicted by his fellow officers. Moreover, even if his story were to be believed in its entirety, the government failed as a matter of law to meet its burden of proving that the stop, frisk and search of Mr. Edwards was lawful.

    A. The Stop

        1. Legal Standard

A police officer may briefly detain and question an individual without a warrant and without probable cause only where the officer has a reasonable suspicion "that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). In evaluating whether an officer's reasons for a stop are legally sufficient, a court must determine if the officer had a "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United States v. Bayless, 201 F.3d 116, 132 (2d Cir.2000); see also, United States v. Scopo, 19 F.3d 777, 781 (2d Cir.1994). Courts are to consider the totality of the circumstances in determining "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Id.

The standard for conducting a frisk is higher still. In order to conduct a lawful frisk without a warrant and without probable cause to arrest, the police must have an objectively reasonable belief not just that criminal activity is afoot but also that the suspected person is armed and presently dangerous. See, e.g., Ybara v. Illinois, 444 U.S. 85, 93 (1979)("Nothing in Terry can be understood to allow a generalized 'cursory search for weapons'..."); United States v. Jaramillo, 25 F.3d 1146, 1151 (2d Cir.1994) (in order to frisk for weapons, the police must have a reasonable belief that the individual is "armed and presently dangerous to the officer or

others.").

Once a defendant has demonstrated a reasonable expectation of privacy in the place searched, the burden of proof shifts to the government to prove that there was a legitimate basis for the search. See United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993). A person has a reasonable expectation of privacy in a car over which he has control and that he has permission to use. See United States v. Ochs, 595 F.2d 1247 (2d Cir. 1979).

### 2. Detective Scialabba's Account is Not Credible

Detective Scialabba's credibility is central to the Government's claim of a lawful stop, frisk and search. He was the officer who decided to stop Mr. Edwards, and he was the only Government witness to proffer even the slightest basis for doing so. His account is both inherently implausible and contradicted by his fellow officers on every key issue.

Detective Scialabba was the only detective of the three present to claim that Mr. Edwards was carrying a towel while walking to his car, that Mr. Edwards was walking quickly to his car or that he made a downward motion as though he was placing something in the car. This, despite the fact that Detective Estwick viewed Mr. Edwards for approximately 10 to 15 seconds while he was walking down the sidewalk, and Detective Abdurrahim observed Mr. Edwards as he was getting into his car. Neither saw any of the things Detective Scialabba claims to have seen.

Detective Scialabba is also the only one to claim that he had information from an informant that the suspect they were looking for was a black man with braids. The other two detectives stated that the only reason they stopped Mr. Edwards was that Detective Scialabba suggested they do so. Detective Abdurrahim stated that he was never given any description of a suspect and thought they were responding to a 911 call. Detective Estwick stated only that he

saw pictures of tall, black men, but never mentioned braids and never mentioned an informant.

Detective Scialabba's story about the braids as a basis for the stop is further belied by the arrest intake form which shows that Mr. Edwards was wearing a baseball cap at the time of his arrest. (Attached hereto as Def. Ex. E).[2] Mr. Edwards' hair simply could not have been visible to Detective Scialabba upon first sighting him.

Another sign that Detective Scialabba is not credible is the significant difference between his testimony and the statements he made to the triggerlock detective, Joseph Fitzgerald. When speaking to Detective Fitzgerald, Detective Scialabba stated that he spotted Mr. Edwards carrying a towel "wrapped around what appeared to be a heavy object." (See Complaint, attached as Ex. C to Defendant's initial motion). He also stated that when he and Detective Abdurrahim approached Mr. Edwards' car, Mr. Edwards refused to roll down his window to speak with them, that he refused to produce the car's registration, and that "[d]espite repeated requests for his driver's license, Edwards refused to produce it." (Id.).

It is no wonder that Detective Scialabba chose not to stick with that earlier story of events. First, he must have realized that it would be absurd to claim on the witness stand that he could "see" the weight of the object he claimed Mr. Edwards was carrying underneath a towel -- especially when that "heavy object" weighed just slightly more than two pounds. Second, upon reflection, he must have known that Mr. Edwards did indeed have a valid driver's license and registration, that it would not have made any sense for Mr. Edwards to refuse to hand those items over, and that his partner, having received that information from those items would not

---

[2] Because of the unavailability of the author of the report, Detective Velez, at the hearing, the Government consented to the admission of this exhibit.

corroborate his story.

Lastly, Detective Scialabba's story is belied by the distance and angle at which he claims to have viewed events. Conservatively assuming the width of a parking space is five feet, he claims to have seen Mr. Edwards carrying a towel close to his body in a way that was somehow suspicious, at a distance of approximately 125 feet, in poor lighting conditions, with a solid row of cars impeding his view. He further claims to have seen Mr. Edwards lean into his car in a way that was somehow suspicious despite the fact that Mr. Edwards' car door opened in the direction of the officers so as to impede their view of his movement. Given these circumstances, it comes as no surprise that neither of Detective Scialabba's fellow officers corroborate his story, despite their same ability to view Mr. Edwards.

### 3. Even Assuming Detective Scialabba's Version, the Stop was Unlawful

Even if Detective's Scialabba's version of events had been credible, it does not provide a reasonable and specific basis for suspecting that Mr. Edwards was engaging in criminal activity, much less that he was armed and presently dangerous. He claimed to see Mr. Edwards walking quickly down the sidewalk carrying a towel close to his body. The report of shots fired from earlier in the day was not close in time to Mr. Edwards' stop, did not describe Mr. Edwards with any particularity, did not describe any activity of his and did not describe any item that he was carrying.

The Terry opinion itself resolves the issue here: "In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts..." Terry, 392 U.S. at 27. Even under Detective Scialabba's own

account, his basis for stopping Mr. Edwards was nothing more than a hunch. It had been hours since the report of a shooting; there was nothing about the description he had that distinguished Mr. Edwards from hundreds, if not thousands, of other residents in that immediate vicinity;[3] and he witnessed him carrying a towel close to his body and walking quickly to his car. Nothing about those facts, taken individually or as a whole, objectively suggests criminal conduct.

Moreover, Mr. Edwards' conduct simply could not have risen to the level of particularized suspicion if Detective Estwick, who observed Mr. Edwards for 10 to 15 seconds while Mr. Edwards was walking to his car, noticed nothing unusual about him: not a towel, not walking quickly, nothing. If Mr. Edwards was carrying a towel as Detective Scialabba claims, he could not possibly have been doing so in such a manner as to trigger the objective and specific requirements of Terry.

And even if those facts could somehow justify a stop, they certainly do not justify the further intrusion of a frisk and search. Nothing about Mr. Edwards' conduct suggested that he was armed and presently dangerous. Detective Scialabba never testified that he thought, or even suspected, that Mr. Edwards was carrying a gun underneath the towel. Giving Detective Scialabba every benefit of the doubt, the most he could have reasonably thought was that Mr. Edwards was concealing some unknown contraband.[4]

---

[3] The physical description of a tall, black man with braids in the Edenwald houses is no more specific than a tall, white man with his hair parted to the right on Wall Street at lunch hour. Nor is Mr. Edwards particularly tall: the arrest report has him listed (generously, in counsel's view) as 6 feet, 0 inches. Nothing about that height can possibly constitute a distinguishing characteristic.

[4] As Detective Scialabba admitted, one of the things he was looking for was whether someone in the neighborhood had something in their waistband because that is the common way people carry guns. (Tr. at 37). It would turn logic on its head to suggest that an atypical way of

The only other conduct the Government can point to is Detective Abdurrahim's statement that after the officers had stopped Mr. Edwards and while he was seated in his car, he was "evasive, moving his arms a lot and looking over his shoulder." That contention does not suffice for several reasons. First, Detective Scialabba who conducted the search of the car, and who found the weapon, was apparently not aware of any of that conduct. He stated that Mr. Edwards was compliant and made no mention of any "evasive" conduct.

Second, Detective Abdurrahim's testimony was entirely generalized and vague on this point. The Government bears the burden of proving that the police had particularized reasons for thinking Mr. Edwards was armed and dangerous, and Detective Abdurrahim's testimony falls far short of particularized reasoning. Mr. Edwards never refused to produce the documents he was asked for, and he never refused to answer the officers questions. And according to Detective Abdurrahim, Mr. Edwards was seated with Detective Abdurrahim standing over him holding open his door at the time he was being "evasive." How "evasive" could Mr. Edwards possibly have been under those circumstances in this seconds-long encounter? Certainly not evasive enough to provide a particularized basis for deeming him armed and dangerous.

Lastly, even if he were somehow evasive, that conduct is not probative in the least of Mr. Edwards being armed and presently dangerous. In fact, being somewhat evasive might be a common reaction for someone who is approached by plain clothes detectives apropos of nothing. See, e.g., United States v. Crump, 62 F.Supp.2d 560, 565 (D.Conn. 1999) ("the fact that the defendant was acting 'a little nervous' has limited significance since most citizens whether

---

carrying a gun -- in a towel, out in the open -- provided Detective Scialabba with an objectively reasonable basis for believing it was a gun.

innocent or guilty, are likely to exhibit some signs of nervousness when confronted by the police.").

As noted in Mr. Edwards' initial brief, courts within the Second Circuit have found reasonable suspicion lacking for a Terry stop or frisk under far more suspicious circumstances than those present here. See, e.g., United States v. Antuna, 186 F.Supp.2d 138, 145 (D.Conn. 2002) (no reasonable suspicion for stop where officer spotted someone he thought was wanted, who quickly looked away upon seeing the police and then intently watched the police after they drove away); United States v. Arenas, 37 F.Supp.2d 322, 327 (S.D.N.Y. 1999) (no reasonable suspicion for stop or frisk where officers spotted a group of three men that appeared to be falsely posing as tourists and walking in an unusual formation, entered a store with one man appearing to act as a lookout and upon making eye contact with the police left the store, walked quickly away and placed a dark object in his jacket pocket.); Crump, 62 F.Supp.2d 560, 564 (no reasonable suspicion for stop or frisk where officer believed defendant was deliberately trying to avoid a vehicle checkpoint in a high crime neighborhood by turning his car around and then after being stopped began to walk away from officer, acted a little nervous, and placed his hands in his pocket).

Where the totality of circumstances is devoid of objectively suspicious behavior, the mere accumulation of otherwise innocent behavior cannot suffice to rationalize a stop and frisk. As Judge Chin stated in Arenas when recounting the myriad claims by the police of suspicious behavior and finding the claims lacking under Terry: "[w]hether viewed individually or collectively, virtually every one of the above actions constituted innocent behavior." 37 F.Supp.2d at 327. The same holds true here. Nothing about Mr. Edwards' conduct, either

17

individually or collectively, suggested criminal activity, much less that he was armed and presently dangerous.

The police did not have an objectively specific and articulable basis for believing Mr. Edwards was armed and dangerous, and his frisk and the search of his car was unlawful.

## Conclusion

The evidence recovered from the car in this case should be suppressed. The police did not have a warrant, did not have probable cause to arrest Mr. Edwards or to search his car and did not have an objectively reasonable and specific basis to believe that he was engaging in criminal activity or that he was armed and presently dangerous.

**Wherefore**, it is respectfully requested that this Court enter an order suppressing the physical evidence obtained by the New York Police Department in violation of the Fourth Amendment to the United States Constitution.

Dated: New York, New York
      September 19, 2007

                                                LEONARD F. JOY, ESQ.
                                                Federal Defenders of New York
                                                Attorney for Defendant
                                                 **Kareem Edwards**
                                                52 Duane Street - 10th Floor
                                                New York, New York  10007
                                                Tel.:  (212) 417-8762


                                                _____
                                                **DAVID E. PATTON**

TO:    MICHAEL J. GARCIA, ESQ.
         United States Attorney
         Southern District of New York
         One St. Andrew's Plaza

New York, New York  10007
Attn.:   **BENJAMIN NAFTALIS, ESQ**.
         Assistant United States Attorney