UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA        :        **07 CR. 719 (WHP)**

      - v -        :

**KAREEM EDWARDS**        :

      Defendant.        :

-------------------------------------------------------X

**DEFENDANT KAREEM EDWARDS' POST-HEARING MEMORANDUM IN REPLY
TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS
EVIDENCE BASED UPON AN ILLEGAL STOP, SEARCH AND SEIZURE**

          LEONARD F. JOY, ESQ.
          Federal Defenders of New York
          Attorney for Defendant
          **Kareem Edwards**
          52 Duane Street - 10th Floor
          New York, New York 10007
          Tel.: (212) 417-8762

          **DAVID E. PATTON, ESQ.**

TO:    MICHAEL J. GARCIA, ESQ.
       United States Attorney
       Southern District of New York
       One. St. Andrew's Plaza
       New York, New York 10007
       Attn: **BENJAMIN NAFTALIS, ESQ.**
          Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA          :          07 CR. 719 (WHP)

    - v -                                              :

**KAREEM EDWARDS,**                       :

        Defendant.                      :

-------------------------------------------------------X

**DEFENDANT KAREEM EDWARDS' POST-HEARING MEMORANDUM IN REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS EVIDENCE BASED UPON AN ILLEGAL STOP, SEARCH AND SEIZURE**

**INTRODUCTION**

The Government's response to Mr. Edwards' motion is premised on a flawed analysis of both the facts and the law. With respect to the facts, the Government ignores the differing testimony given by its witnesses, and refers to Detective Scialabba's version of events as that of the "police." It also misstates several key pieces of evidence.

With respect to the law, the Government relies heavily on precedent that is inapposite to the circumstances here. Most significantly, the Government places great weight on a case involving a confidential informant's report of criminal activity by a specific, identifiable person -- a situation far different from that here where the informant allegedly gave nothing more than a vague description of an unknown person.

Under both the facts and the law, the Government has failed to meet its burden of proof, and Mr. Edwards' motion should be granted.

I. **The Government's Brief Ignores and Misstates the Facts**

    A. Ignoring Contrary Testimony

The Government ignores the stark inconsistencies in the testimony of its witnesses, choosing instead to argue its position as though Detective's Scialabba's account was the uncontested version of events. It offers no explanation for why Detectives Estwick (who viewed Mr. Edwards for approximately the same amount of time as Detective Scialabba) and Abdurrahim (who viewed Mr. Edwards as he got into his car) saw nothing suspicious at all – no towel, no quick walking, no bending down into the car. Even if the Court chose to credit Detective Scialabba's version of events, whatever he saw simply could not have objectively risen to the level of reasonably suspecting criminal activity, much less reasonably suspecting that Mr. Edwards was armed and presently dangerous, if his partners who had an equal opportunity to view Mr. Edwards saw nothing suspect whatsoever.

The Government also relies heavily on the timing of Mr. Edwards' stop in relation to Detective Scialabba's claim that the NYPD's evidence collection team was leaving as the detectives arrived at the horseshoe. Detective Scialabba's testimony on this point, however, does not withstand scrutiny. First, once again, he is the only officer to make this claim. Detectives Estwick and Abdurrahim did not see any other police officers, evidence collection team or otherwise. Second, and most telling, the timing of his claims does not make sense. All of the officers claim that after rounding the first bend of the horseshoe they drove slowly along the stretch without stopping. Detective Scialabba stated that he first saw Mr. Edwards walking along the sidewalk in front of the two empty parking spaces shown on Government's Exhibit 1, approximately 50 feet from the entrance to 1160. (Tr. at 56, 71). If Detective Scialabba is

3

correct that the evidence collection team was leaving as he and his partners were arriving, Mr. Edwards would have had to have been outside of the building while the evidence collection team was still present. At the very least, under Detective Scialabba's version, when the evidence collection team left, Mr. Edwards would have had to have been standing right at the door to 1160, holding a gun, within a few feet of police officers who were investigating a call of shots fired. That story is simply implausible on its face. Either the evidence collection team was not still present as Detective Scialabba testified, or Mr. Edwards was not carrying a towel with a gun wrapped in it, or both. But events certainly did not happen as Detective Scialabba described.

Furthermore, the Government relies heavily on the alleged description that Detective Scialabba received from a confidential informant, without any corroboration from his fellow detectives who were never aware of the supposed description or the informant. Because of the government's heavy reliance on the alleged description given by the informant, because the account given by Detective Scialabba is entirely uncorroborated, and because even Detective Scialabba did not state the informant's basis for his information, the informant should be made available as a witness for examination. While ordering the production of a confidential informant for a suppression hearing is not constitutionally mandated, see McCray v. Illinois, 386 U.S. 300 (1967), the decision to do so rests within the sound discretion of the Court. See, e.g., United States v. Holguin, 946 F.Supp. 157, 159 (D.Conn. 1996) (agreeing to conduct an in camera examination of a confidential informant for purposes of a suppression hearing) citing United States v. Raddatz, 447 U.S. 667, 679 (1980). Here, given the suspect nature of Detective Scialabba's testimony with respect to the informant, and his lack of any testimony regarding the informant's basis for the description, the Court should exercise its discretion in favor of

4

disclosure. At the very least, the Court should inquire of the informant <u>in camera</u> to ascertain what description the informant gave Detective Scialabba and what his basis for the description was.[1]

The Government also fails to address the fact that Mr. Edwards, as recorded in the arrest report, was wearing a baseball cap and therefore could not have been viewed as having braids. It is a telling example of Detective Scialabba getting caught red-handed rationalizing the stop based on information he obtained <u>after</u> the stop.

Finally, the Government ignores Detective Scialabba's checkered past of prior allegations of misconduct (by his own account he has had multiple complaints made against him) and the substantiated findings of the CCRB in 2005 that he lied about the circumstances of an illegal stop and frisk. Such a finding is not an everyday occurrence at the CCRB, as evidenced by its extremely low rate of substantiated claims.

Detective Scialabba's testimony was uncorroborated and contradicted by his fellow detectives on every main reason he gave for stopping Mr. Edwards and searching his car. He was not credible, and the Court should reject his version of events.

B. <u>Factual Inaccuracies</u>

The Government is also wrong about several factual claims. It claims that Mr. Edwards was seen exiting the building at 1160 229th St. when that is simply not true. Detectives Scialabba and Estwick claim to have seen him walking down a sidewalk that connects to every building along 229th St., and could not have been closer than 50 feet from the entrance of 1160. (See

---

[1] The defense still maintains that the description of a tall, black man with braids is far too general and vague to have any significance for the stop and frisk in this case.

Govt. Ex. 1; Tr. at 56, 71).

Moreover, in failing to address Detective Scialabba's own shifting story about what happened, the Government continues to assert that Detective Scialabba saw a "heavy object" under the towel despite his most recent testimony to the contrary. (Govt. Ltr. at 8, Tr. at 43-44). This is an understandable mistake on the part of the Government, given Detective Scialabba's earlier statement that one of the reasons he stopped Mr. Edwards was that he saw him with a "heavy object" underneath the towel. See Complaint at ¶¶ 2, 3. On cross-examination, Detective Scialabba claimed not to remember whether he told the trigger-lock detective, Joseph Fitzgerald, that the object he saw was heavy, but admitted the following:

> Q:   But you would agree with me that it would have been impossible for you to actually see simply from viewing whether Mr. Edwards was carrying a heavy object, correct?
>
> A:   Yes.
>
> Q:   And he gave no indication in any way from the way he was walking to the car whether the object was heavy or light, correct?
>
> A:   Correct.

(Tr. at 43-44).

Indeed, in reading the Complaint, which was drafted by Detective Fitzgerald based on his conversation with Detective Scialabba, there is little about the story Detective Scialabba has told that he has managed to keep straight. The inconsistencies in his own story-telling are yet another reason he should not be credited.

## II. The Government's Lack of Legal Support

    A.  United States v. Elmore

Remarkably, the Government relies heavily on United States v. Elmore, 482 F.3d 172 (2d Cir. 2007), contending that the description Detective Scialabba received from his confidential informant, "without more," was sufficient justification for stopping and frisking Mr. Edwards. (Govt. Ltr. at 10). The facts and holding of Elmore, however, are entirely distinguishable from the circumstances of this case. Elmore involved a tip from a woman, Dorothy Mazza, who called a detective to tell him that her recently estranged boyfriend, Vamond Elmore, had several weapons and was likely to do harm to somebody. Id. at 175. She described the weapons with particularity and gave the location of where they were stored. Id. at 176. She informed the detective that one of the guns, a .38 caliber Smith & Wesson, was located in Elmore's car, which she described with particularity as a black, two-door Acura, with tinted windows and brand new Connecticut license plates. Id. She also told him that Elmore was likely to be found in an area of town called Carlton Court. Id. The detective had four different telephone calls with her and over the next two days was able to verify many of her claims through DMV records and by questioning her about prior incidents involving Elmore. He wrote a memorandum about his findings, included with the memorandum a photograph of Elmore, and distributed it to the patrol officers in his precinct. The same night the memorandum was distributed, two police officers spotted Elmore in his black, two door Acura near Carlton Court at approximately 11:30 p.m. Id. The officers not only recognized the car from the description in the memorandum, and Elmore from the photograph, but they also personally recognized Elmore from previous encounters with him. Id. They stopped the car, ordered Elmore out and found the .38 underneath the driver's

seat. Id.

The district court suppressed, finding that the tipster, Ms. Mazza, was anonymous and that under Alabama v. White, 496 U.S. 325 (1990) and Florida v. J.L., 529 U.S. 266 (2000), the police did not have enough independent corroboration of her information to justify a stop. The Second Circuit reversed, finding that there are varying degrees of anonymity, and that Ms. Mazza fell much closer to the known end of the spectrum: she had provided her name, cell phone, and home phone numbers and had been reached by a detective at those numbers several times. Her name and address were also verified by DMV records, and she provided certain non-public information about Elmore from a previous incident in which he had been shot.

These facts and the Court's holding have nothing to do with the stop and frisk of Mr. Edwards. No informant, known or unknown, ever gave the police information about "Kareem Edwards" possessing a gun. No informant, known or unknown, ever gave the police a remotely detailed description of Mr. Edwards, other than his race and a common hair style – no age, no item of clothing, no distinguishing characteristics whatsoever. And no informant, known or unknown, ever gave the police the slightest bit of predictive information, much less information that was verified.

The Government argues its case as though the police had received a call from a reliable informant telling them that "Kareem Edwards" had been firing off a gun outside of 1160, that he was wearing blue jeans, a black t-shirt and a black baseball cap, and that he drove a tan Toyota Camry that was parked along the horseshoe of 229th Street. If that was in fact the report the police had received from their informant, and the police had stopped and questioned Mr. Edwards as they did, received his identification and seen that he was Kareem Edwards, they may

have been justified in frisking him for weapons.  But those are not the facts here, and Elmore is not the least bit instructive.

    B.  Florida v. J.L. and United States v. Bold

The Government also spends a great deal of time distinguishing this case from Florida v. J.L.  Mr. Edwards' initial, pre-hearing memorandum of law only relied on J.L., however, because there was no mention of a known, confidential informant in any of the Government's discovery, including the Complaint.  The Complaint and the discovery simply showed that the police were responding to a 911 call of shots fired by a black male -- the same information Detectives Estwick and Abdurrahim testified they had.  Detective Scialabba's alleged reliance on an informant's description was first made clear to the defense when he testified at the hearing.  It is yet another reason why his claim is suspect.

Incredibly, in its same section dealing with J.L., the Government relies on United States v. Bold, 19 F.3d 99 (2d Cir. 1994) to argue that "especially" where an informant's tip is "related to possession of a gun" an "anonymous tip coupled with some corroboration can support a finding of reasonable suspicion." (Govt. Ltr. at 9, n.1).  Bold, though, is no longer good law; it was abrogated by J.L.  See, e.g., United States v. Person, 134 F. Supp.2d 517, 526 (E.D.N.Y. 2001) (noting that the Court in J.L. specifically declined to adopt the 'firearm exception' that Bold upholds"); see also, People v. Breazil, 744 N.Y.S.2d 818 (N.Y. Sup.Ct. 2002) (finding that J.L. announced a new rule replacing the old rule of Bold).

Indeed, J.L. explicitly rejected the position advanced by the Government here and upon which Bold was based; namely that a tip regarding a gun, providing very specific information (in Bold, that a 21-year old, black male in a hooded sweater in four-door, gray Cadillac parked at a

9

specific location possessed a gun and in J.L., a specific description of clothing coupled with a precise location), should suffice for a stop or frisk because of the added danger inherent with firearms. The holding of J.L. was an outright rejection of that test.

Again, even if Bold were good law, the Government's argument must fail because there was no specific description given here.

### C. The Totality of the Circumstances

The Government correctly states that the Court should consider the totality of the circumstances in evaluating the legality of the stop, frisk and search. It utterly fails, however, to identify sufficient circumstances to warrant them. The Government contends that the following four factors support its position:

> "[1] the earlier shooting at 1160 East 229; [2] the reliable CI's description of the shooter and his location, [3] the timing of the defendant's departure from 1160 East 229, i.e., immediately after the police had left the scene, and [4] the defendant's actions and demeanor."

(Govt. Ltr. at 11). First, the timing of the report of shots fired in no way contributes to the reasonableness of suspecting Mr. Edwards. The report had come at least three hours earlier in the day, and as the officers testified, there were plenty of other people out in the neighborhood. This is not a case involving a late night stop in an isolated area where a crime had been recently reported (as are the circumstances in many of the cases cited by the Government). This was early evening in a lively neighborhood and there was nothing whatsoever connecting Mr. Edwards to that report.

Second, as previously noted, the informant's description, regardless of how reliable it may or may not have been, was utterly vague. Even taking Detective Scialabba at his

10

uncorroborated word, the description contained nothing more than the generalities of tall and black with braids. It did not include many general characteristics such as clothing, age, facial features or weight, and it did not include <u>any</u> distinguishing characteristics that would have particularly identified Mr. Edwards.

Third, the timing of Mr. Edwards' "departure from 1160 East 229" is a complete non-factor because there was no testimony from anybody that he <u>was</u> departing 1160. Instead, under the most generous reading of Detective Scialabba's testimony, Mr. Edwards was seen at least 50 feet from the entrance to 1160, walking along the sidewalk that connects every building in the Edenwald houses.

Lastly, Mr. Edwards "actions and demeanor" could not possibly have given rise to the stop and search. Holding a towel close to one's body and walking quickly to a car is just not indicative of criminal behavior. And there was nothing about his walk to the car that gave either of Detective Scialabba's fellow officers reason to suspect him of anything, much less suspect him of being armed and dangerous. Nor was his demeanor after the stop indicative of being armed and dangerous. The only testimony supporting the Government's view on this point came from Detective Abdurrahim who stated that while he was standing over Mr. Edwards at the driver's side door, Mr. Edwards was evasive, moving his arms and looking over his shoulder. This, despite the fact that Mr. Edwards never disobeyed any commands, never made an effort to flee, and produced his valid driver's license and registration as he was asked. The so-called "evasive" conduct appears to be that Mr. Edwards alternately stated both that the car was his and that it was his father's. Not only is this not evasive, it is true. The car was registered to his father, but Mr. Edwards had permission to use it, and he showed the detective the registration bearing the same

last name of Edwards to prove it.

The totality of the circumstances approach should not be a license for the Government to accrue as many innocent pieces of conduct as possible to argue that together they create suspicious behavior. Virtually any accumulation of behavior can be rationalized as suspicious -- especially after the fact, when a police officer is called upon to explain his behavior. Nothing about Mr. Edwards, taken individually or collectively, was objectively indicative of criminal behavior. The additional facts of the vague description and a shooting earlier in the day simply do not add anything to the equation -- and they certainly do not add enough for a particularized finding that Mr. Edwards was armed and dangerous.

D.  The Search of the Car

Lastly, the Government relies on Michigan v. Long, to argue that because the officers had sufficient basis to frisk Mr. Edwards, they also had sufficient basis to search his car. Long, however, is distinguishable from this case in many respects. As the Court in Long stated, police must possess an objectively reasonable belief based on "specific and articulable facts" that a person is armed and dangerous to warrant a limited search for weapons in a person's car during a traffic stop. 463 U.S. 1032, 1049 (1983).

Here, vague descriptions and generalities about "evasive" conduct that fly in the face of Mr. Edwards's actual conduct -- i.e., total compliance with police requests and commands and no threatening behavior -- fall far short of the required showing. Courts are rightly concerned about police safety during stops of motorists -- especially in circumstances like those in Long where a stop is made late at night on an empty stretch of highway and an officer observes a weapon in plain view on the floorboard at the feet of an apparently intoxicated driver. The facts here,

12

though, could not be more different. Mr. Edwards was stopped in at 8:30 in the evening in a well-populated, residential area, where he was completely compliant with the officers' requests. Under the Government's best view of the evidence, only one of the three detectives claims Mr. Edwards was carrying a towel to his car. That same detective then searched inside the car without having seen any weapon or other contraband in plain view and without Mr. Edwards having given him any reason to believe he was armed and dangerous. In fact, at no time during his testimony did Detective Scialabba ever say that he <u>subjectively</u> thought that Mr. Edwards was armed and dangerous, nor did he claim that he searched the car for his safety. Under the actual objective standard, the Government has fallen far short of meeting its burden under <u>Long</u>.

### III.  The Real Facts

All of the objective evidence points to the fact that Mr. Edwards was not in fact the person shooting off a gun outside of 1160 earlier in the day. The evidence collection team took shell casings from the scene and analyzed them. The Government has not disclosed the results of that testing, but as Detective Scialabba admitted on cross-examination, if they had come back as a match to the gun that was found in Mr. Edwards' car, he would have heard about it. (Tr. at 50). In addition, the gun found in his car was not missing any rounds, and given that Mr. Edwards lives in 1154 229th St., it wouldn't make much sense for him to have holed up in 1160. This, of course, does not mean that the police, given the right circumstances, could not have reasonably suspected him of the shooting even when he did not do it. It does, however, indicate the incredible nature of Detective Scialabba's testimony about Mr. Edwards purposely leaving 1160 on the heals of the evidence collection team's departure and his alleged towel-carrying demeanor. If Mr. Edwards was not the person shooting off rounds (and he clearly was not) the behavior

described by Detective Scialabba does not make sense in the least.

Detective Scialabba has a rich and full history of stopping and frisking people. By his own admission he has stopped and frisked thousands of people, including stops made at 1160 earlier in the day looking for trespassers during his "vertical" by asking people he saw in the building for identification. From his demeanor on the witness stand and his testimony, it is hard to imagine that he is concerned about the niceties of reasons for his stops. Nor does he ever really face consequences for stops and frisks that are not justified. On the rare occasion when someone complains after he does not find something, the complaint is not likely to stick. On the rarer occasion still where a complaint is substantiated, he receives a lecture. On the occasion when some sort of contraband is found, the worst that will happen is that the person will spend months in jail before their claim of a wrongful stop is adjudicated. And regardless of the outcome, he will suffer no consequence.

Here, a generous view of the evidence suggests Detective Scialabba stopped Mr. Edwards based on a hunch. And upon finding the towel and the gun underneath the driver's seat, he simply claimed to have seen Mr. Edwards walking with them beforehand.

## CONCLUSION

The evidence recovered from the car in this case should be suppressed. Detective Scialabba's account of events is not credible, and even if it was, the Government has failed as a matter of law to demonstrate that the stop, frisk and search were legal.

**Wherefore**, it is respectfully requested that this Court enter an order suppressing the physical evidence obtained by the New York Police Department in violation of the Fourth Amendment to the United States Constitution.

Dated: New York, New York
       September 25, 2007

                                                    LEONARD F. JOY, ESQ.
                                                    Federal Defenders of New York
                                                    Attorney for Defendant
                                                       **Kareem Edwards**
                                                    52 Duane Street - 10th Floor
                                                    New York, New York  10007
                                                    Tel.:  (212) 417-8762

                                                    _____
                                                    **DAVID E. PATTON**

TO:    MICHAEL J. GARCIA, ESQ.
           United States Attorney
           Southern District of New York
           One St. Andrew's Plaza
           New York, New York  10007
           Attn.:   **BENJAMIN NAFTALIS, ESQ**.
                     Assistant United States Attorney